IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KIM RORKE,                         :        Case No. 4:16-CV-0219
                                   :
            Plaintiff,             :
                                   :        Judge Brann
      v.                           :
                                   :
AUBREY ALEXANDER TOYOTA,           :
MICHAEL ANDRETTA,                  :
                                   :
            Defendants.            :
                                   :

## MEMORANDUM OPINION

December 22, 2016

## I.        BACKGROUND

Kim Rorke, hereinafter "Rorke," filed a three count complaint against both her former employer, Aubrey Alexander Toyota, hereinafter "Aubrey Alexander," and former supervisor, Michael Andretta, hereinafter "Andretta."  Counts I and II assert claims of retaliation under Title VII and the Pennsylvania Human Relations Act.  Count III alleges intentional infliction of emotional distress.  Defendants filed a motion to dismiss, and upon careful review of the pleadings and the briefs both in

support and against the motion, I will grant the motion to dismiss.  However, I will provide Rorke with one final opportunity to amend her complaint.[1]

## II.    MOTION TO DISMISS LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may file a motion to dismiss for "failure to state a claim upon which relief can be granted." Such a motion "tests the legal sufficiency of a pleading" and "streamlines litigation by dispensing with needless discovery and factfinding."[2] "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."[3] This is true of any claim, "without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one."[4]

Beginning in 2007, the Supreme Court of the United States initiated what some scholars have termed the Roberts Court's "civil procedure revival" by significantly tightening the standard that district courts must apply to 12(b)(6) motions.[5] In two landmark decisions, *Bell Atlantic Corporation v. Twombly and Ashcroft v. Iqbal*, the Roberts Court "changed . . . the pleading landscape" by "signal[ing] to lower-

---

[1] Rorke has amended her pleadings once as a matter of course, and the action is now proceeding on a first amended complaint.

[2] *In re Hydrogen Peroxide Litigation*, 552 F.3d 305, 316 n.15 (3d Cir. 2008) (Scirica, C.J.) (*quoting Szabo v. Bridgeport Machines, Inc.,* 249 F.3d 672, 675 (7th Cir. 2001) (Easterbrook, J.)). *Neitzke v. Williams,* 490 U.S. 319, 326–27 (1989).

[3] *Neitzke*, 490 U.S. at 326 (*citing Hishon v. King & Spalding,* 467 U. S. 69, 73 (1984)).

[4] *Neitzke*, 490 U.S. at 327.

[5] Howard M. Wasserman, THE ROBERTS COURT AND THE CIVIL PROCEDURE REVIVAL, 31 Rev. Litig. 313 (2012).

court judges that the stricter approach some had been taking was appropriate under the Federal Rules."[6] More specifically, the Court in these two decisions "retired" the lenient "no-set-of-facts test" set forth in *Conley v. Gibson* and replaced it with a more exacting "plausibility" standard.[7]

Accordingly, after *Twombly* and *Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[8] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[9] "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."[10] Moreover, "[a]sking for plausible grounds . . . calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [wrongdoing]."[11]

The plausibility determination is "a context-specific task that requires the

---

[6]  550 U.S. 544 (2007); 556 U.S. 662, 678 (2009). Wasserman, *supra* at 319–20.

[7]  *Iqbal*, 556 U.S. at 670 (*citing Conley v. Gibson*, 355 U.S. 41 (1957)) ("[a]cknowledging that *Twombly* retired the *Conley* no-set-of-facts test").

[8]  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

[9]  *Iqbal*, 556 U.S. at 678.

[10]  *Connelly v. Lane Const. Corp.*, 809 F.3d 780 (3d Cir. 2016) (Jordan, J.) (internal quotations and citations omitted).

[11]  *Twombly*, 550 U.S. at 556.

reviewing court to draw on its judicial experience and common sense."[12] No matter the context, however, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"[13]

When disposing of a motion to dismiss, a court must "accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff]."[14] However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions."[15] "After *Iqbal*, it is clear that conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss."[16] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[17]

As a matter of procedure, the United States Court of Appeals for the Third Circuit has instructed that:

> Under the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps. First, it must tak[e] note of the elements [the] plaintiff must

---

[12] *Iqbal*, 556 U.S. at 679.
[13] *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 557 (internal quotations omitted)).
[14] *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008) (Nygaard, J.).
[15] *Iqbal*, 556 U.S. at 678 (internal citations omitted).
[16] *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (Nygaard, J.).
[17] *Iqbal*, 556 U.S. at 678.

plead to state a claim. Second, it should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, [w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.[18]

The Court now turns to the specifics of the instant matter.

## III.   DISCUSSION

### a.   FACTS

Taking the facts alleged in the complaint as true, as I must when considering a motion to dismiss, the narrative that unfolds is as follows:

Rorke, a female, was a sales consultant working for Aubery Alexander.  She worked for the dealership from August 6, 2008 through February 9, 2015.  She claims constructive discharge due to a sexually hostile environment.

Rorke asserts that her "job went smoothly" before Andretta was hired as  the general manager of the dealership in May or June of 2012.[19]  Rorke asserts that by January 2013, "Andretta had become an intimidating and degrading presence with a particular hostility toward women."

Rorke alleges the following as evidence of discrimination:

---

[18]   *Connelly*, 809 F.3d at 787 (internal quotations and citations omitted).
[19] It is not clear from the compliant precisely when Andretta was hired.

¶ 22  In or around November, 2013 he made Plaintiff deliver a car to Benton, PA an area of Pennsylvania unfamiliar to her.

¶ 23.  Plaintiff told Andretta she was uneasy about making the trip.

¶ 24.  Because Andretta forced Plaintiff to make the delivery, she had a severe anxiety attack and had to phone David Catlin and Mike Rorke for help to come pick her up at the location in Northumberland, Pennsylvania.

¶ 25.  Plaintiff could not complete the delivery.

¶ 26.  David Catlin took Plaintiff to her house, and the next day she had to go to the doctor when medication was dispensed and severe anxiety diagnosed.

¶ 27.  The anxiety was a direct consequence of having worked for Andretta for almost a year.

¶ 28.  Because of the impact of the attack Plaintiff was afraid to drive a vehicle for 3 weeks.

¶ 29.  Prior to Andretta coming on board, Plaintiff never had any emotional psychological issues.

¶ 30.  Throughout 2013-2014 both in Plaintiff's office and in a common sales area, Andretta would use profanity and intimidate the

sales associates by slamming filing cabinets, throwing items and using profanity and degrading remarks.

¶ 31.  In morning meetings, Andretta would humiliate sales associate, David Catlin, while degrading women at the same time.

¶ 32.  Often the brunt of Andretta's jokes towards David Catlin involved David's sexual orientation and comments involving David's ex-wife and his then girlfriend.

¶ 33.  For example Andretta would ask David if he showered with both his ex-wife and his girlfriend at the same time.

¶ 34.  When Bryan Sage, the business manager, was employed Andretta would often refer to his wife as a "Crazy Bitch."

¶ 35.  The phrase "crazy bitch" was said regularly around Plaintiff and other employees.

¶ 36.  Andretta called female employee Shannon Fink a "Pop Tart" which had a sexual and degrading meaning.

¶ 37.  Andretta would sometimes page her over the loud speaker using this nick name.

¶ 38.  Throughout Plaintiff's employment, Andretta would occasionally refer to her as "Toots" and then say, "Oh, I can get in trouble for calling you that can't I?"

¶ 39.  Andretta often referred to all of the employees as "Ass Clowns" and told them to "grow a set of balls" and tell the customer how it was going to be.

¶ 40.  Andretta consistently 'fined' Plaintiff and other employees for various instances such as not wearing a name tag in the morning.

¶ 41.  These "fines" were used as intimidation and went into a jug for a personal beer fund and lunches.

¶ 42.  Various sales managers and associates knew this money was used for beer.

¶ 43.  Andretta would use expletives like "Wake the fuck up" and "What the fuck is wrong with you" in morning meetings to the sales staff as a group.

¶ 44.  In or around February 2014, he physically confronted another manager, Dennis Christiana, grabbing him by this shirt and forcing him through the back door while verbally abusing him in the process.

¶45.  In or around late summer of 2014, Andretta took one of Plaintiff's customers who was properly documented and gave them to a male associate as a form of power and intimidation.

¶ 46.  The male associate never had anything to do with the sale and his transfer of this customer went directly against the code of sales conduct.

¶ 47.  The transfer event put so much stress and anxiety on Plaintiff that evening she had to leave work at 6:00 p.m. because anxiety overcame her.

¶ 48.  Andretta told Plaintiff that if she left, "Don't come back until I call you."

¶ 49.  In effect, Plaintiff was suspended from employment because she protested his illegal actions and became sick because of them.

¶ 50.  He texted Plaintiff two days later and said to come back at this time.

¶ 51.  In or around the fall of 2014, Plaintiff was standing next to Andretta when he was working a deal for another sales associate involving a husband and wife.

¶ 52.  Andretta became increasingly frustrated with the deal and said to a group of employees including Plaintiff that there is too much "P.O.T.P." at that table.

¶ 53.  Plaintiff questioned what that meant, and Andretta said to Plaintiff "Don't worry you have plenty of it" while laughing.

¶ 54.  Sales Manager, Matt Burd, looked at Plaintiff and put his head down with embarrassment.

¶ 55.  Another sales associate, Chad Scholl informed Plaintiff that when Andretta used "P.O.T.P." it was known among other sales associates to mean "Power of the Pussy", clearly a vulgar and obscene reference.

¶ 56.  A sign with P.O.T.P. on it actually hung in the Defendant's Internet office, which Plaintiff noticed in February 2015.

¶ 57.  In or around November 2014, a female employee, Ashley Fry quit due to conditions and hostile environment he had created.

¶ 58.  In or around December 2014, per the instructions of Sales Manager, Dennis Christiana, Plaintiff handed Andretta a request for vacation.

¶ 59.  Andretta took the piece of paper with Plaintiff's request, threw it, used profanity and told Sales Manager Dennis Christiana "It wasn't the Dennis Christiana show, and Mike Andretta runs the show".

¶ 60.  Plaintiff's request was within company policy.

¶ 61.  During a morning meeting, Andretta made a racial comment asking sales associate, Rick Shover, "Which family got the Weis gift card, the white family or black family.?"

¶ 62.  Andretta did this because Shover had a wife and girlfriend, each of a different color.

¶ 63.  In or around January 2015, during another morning meeting, Andretta made several degrading comments towards women including asking sales associate Rick Shover, "Who did you sleep with last night, your wife or your girlfriend."

¶ 64.  On January 1, 2015 Plaintiff was entitled to two weeks paid vacation, plus one personal day.

¶ 65.  Plaintiff made a request to Andretta.

¶ 66.  Andretta used intimidation and power to force Plaintiff to only collect one week's vacation in January and she had to wait to collect the second week in February.

¶ 67.  Plaintiff's request for both weeks complied with company policy and should have been paid in one sum.

¶ 68.  Andretta set a new verbal policy in place only allowing employees to sign out for 20 minutes to eat lunch during a full 11-12 hour work day.

¶ 69.  Plaintiff feared punishment and retaliation.

¶ 70.  In January and until her last day, Plaintiff conformed to Andretta's lunch policy.

¶ 71.  At the end of January 2015, Andretta held a Friday morning meeting with the entire sales team when he referred to them as being "nigger rich".

¶ 72.  Andretta told an African American employee, Kendall Corbett to cover his ears prior to making this comment.

¶ 73.  In addition, in the same month, Andretta took away the salary Plaintiff had the last several years which was an integral part of her pay plan.

¶ 74.  When Plaintiff questioned Andretta about it, he could not give Plaintiff a clear reason as to why it had been taken away – other than to ask Plaintiff why she deserved the pay plan.

¶ 75.  Plaintiff told Andretta she was a good employee who sold a lot of cars, she came to work on a regular basis and she did her job in a professional manner.

¶ 76.  Plaintiff told Andretta that when a company takes something away like that, it is generally because the employee had done something wrong.

¶ 77.  A week or two later, in or around February 2015, another female employee Shannon Fink fell on ice and reported the incident to workman's compensation.

¶ 78.  Office Manager Terry Stauffer informed Andretta that Shannon would be receiving care but still be able to work.

¶ 79.  Andretta became noticeably upset and said "I will never hire another women [sic] in the sales department again".

¶ 80.  On or about February 6, 2015, Plaintiff participated in a "lineup" for the last time.

¶ 81.  A "lineup" included all the sales associates lining up in front of Andretta's desk where they were constantly humiliated and as a form of punishment, often this would happen in front of customers and with other employees.

¶ 82.  On February 9, 2015, Andretta [sic] was not present in the morning meeting.

¶ 83  However, on or about February 9, 2015, Andretta was in a very hostile mood and verbally abused another female employee, Shannon Fink.

¶ 84.  Plaintiff questioned Andretta about a car deal that took place on or about Saturday February 7, 2015.

¶ 85.  Plaintiff questioned why she had not received commissions that were due to her.

¶ 86.  Sometime thereafter, Andretta became verbally aggressive using profanity and degrading comments directly to Plaintiff.

¶ 87.  There was no formal HR process for employee concerns to be heard so Plaintiff left work as the conditions became too much for her to handle.

¶ 88.  Upon information and belief, all employees were only able to make complaints to three individuals, 1.) Blaise Alexander, 2.) the general manager of a specific dealership and 3.)  the employee's immediate supervisor.

¶ 89.  Because of the aggressive nature exhibited by Andretta, Plaintiff felt as if she could not go to HR for fear of further retaliation from Andretta.

¶ 90.  At one point, Andretta said to Plaintiff repeatedly, "You need me more than I need you."

¶ 91.  Andretta effectively stopped people from filing internal complaints by taking away job "perks" as a method and practice of instilling fear in other employees.

¶ 92.  Another female employee, Lori Selig, was humiliated and degraded by Andretta in front of other male employees causing her to quit as well.

14

¶ 93.  Additionally, another female employee, Ashley Fry was repeatedly humiliated and often to the extent of bringing her to tears which would prompt Andretta to laugh.

¶ 94.  Andretta would joke about having bets whether or not he would make Ashley Fry cry on any given day.

¶ 95.  Another female employee, Shannon Fink was also humiliated and tormented by Andretta.

¶ 96.  In one instance, Plaintiff along with several other employees witnessed Andretta give Fink money and say "Go to the mall and buy a new shirt, you look like a hooker."

¶ 97.  Andretta would often say that any complaints better not end up over his head.

¶ 98.  Andretta also made it known that if employees did not like their job, they should just quit and not plan on ever working at any Alexander dealership because he would make sure the employee would not be hired.

¶ 99.  By February 9, 2015, Plaintiff could no longer stand it and on February 15, 2015, she filed for unemployment compensation due to a hostile environment.

Rorke filed a timely charge of discrimination with the Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission. She received a right to sue letter on November 10, 2015.

### b. ANALYSIS

<u>COUNT I: TITLE VII VIOLATIONS AGAINST AUBREY ALEXANDER TOYOTA AND COUNT II: PENNSYLVANIA HUMAN RELATIONS ACT AGAINST ALL DEFENDANTS</u>

Recently, in *Connelly v. Lane Construction Corp,*[20] the Third Circuit provided guidance to district courts on the intersection of a motion to dismiss[21]and Title VII.[22] Defendants argue that Plaintiff's retaliation claims should be dismissed for failure to plead a *prima facie* case of discriminatory retaliation. This argument fails.

Both the Third Circuit and the United States Supreme Court have made it patently clear that a plaintiff need not plead a *prima facie* case to survive a motion to dismiss. Judge Kent A. Jordan, writing for the *Connelly* court explained,

> It is thus worth reiterating that, at least for purposes of pleading sufficiency, a complaint need not establish a prima facie case in order to survive a motion to dismiss. A prima facie case is "an evidentiary standard, not a pleading requirement," *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 510, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), and hence is "not a proper measure of whether a complaint fails to state a claim."

---

[20] 809 F.3d 780 (3d Cir. 2016).
[21] Federal Rule of Civil Procedure 12(b)(6).
[22] 42 U.S.C. § 2000e *et. seq.*

16

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir.2009). As we have previously noted about pleading in a context such as this,

> [a] determination whether a prima facie case has been made ... is an evidentiary inquiry—it defines the quantum of proof [a] plaintiff must present to create a rebuttable presumption of discrimination. Even post-*Twombly*, it has been noted that a plaintiff is not required to establish the elements of a prima facie case....

*Id.* at 213 (citation omitted). Instead of requiring a prima facie case, the post-*Twombly* pleading standard " 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element[s]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir.2008) (*quoting Twombly*, 550 U.S. at 556, 127 S.Ct. 1955).[23]

I turn now to the three step procedure set forth in *Connelly* for evaluating a motion to dismiss.[24]  First, I must recite the elements of the cause of action; next I identify, but assign no assumption of truth, to conclusions of law plead by the Plaintiff;[25] and, finally, I determine if the facts alleged demonstrate a plausible entitlement to relief.

For both Plaintiff's Title VII retaliation claim and claim of retaliation under the PHRA[26] the elements of retaliation are "(1) she engaged in conduct protected

---

[23] *Connelly,* 809 F.3d at 789.

[24] *See id.*  at 787.

[25] Here, the paragraphs from the first amended complaint cited above are entirely composed of alleged facts with no conclusions of law.

[26] "Claims under the PHRA are interpreted coextensively with Title VII claims*." Atkinson v. Lafayette College*, 460 F.3d 447, 454 n. 6 (3d Cir. 2006) (*citing Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)).  Pennsylvania courts "generally interpret the PHRA in accord with its

17

by Title VII; (2) the employer took adverse action against her; and (3) a causal link exists between her protected conduct and the employer's adverse action."[27]  The first element, protected activity, can be in one of two forms – opposing Title VII conduct or participating in a Title VII proceeding.  "Title VII's antiretaliation provision forbids employer actions that "discriminate against" an employee (or job applicant) because he has "opposed" a practice that Title VII forbids or has "made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing."[28]

Rorke has not plead facts to state the first element of a retaliation claim. In sum, Rorke did not allege facts that she "participated" in protected activity.  Nor did Rorke allege facts that she voice her "opposition" to Andretta's actions; in fact, the facts she alleges state the opposite:

> ¶ 87.  There was no formal HR process for employee concerns to be heard so Plaintiff left work as the conditions became too much for her to handle.

> ¶ 88.  Upon information and belief, all employees were only able to make complaints to three individuals, 1.) Blaise Alexander, 2.) the

---

federal counterparts."  *Kelly* 94 F.3d at 105.  "Moreover, the PHRA definition of "handicap or disability" is substantially similar to the definition of "disability" under the ADA.*"  Id.*
[27] *Charlton v. Paramus Bd. of Educ.,* 25 F.3d 194, 201 (3d Cir.1994).
[28] *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 59, 126 S. Ct. 2405, 2410, 165 L. Ed. 2d 345 (2006) *citing* Title VII at 42 U.S.C. § 2000e–3(a).

general manager of a specific dealership and 3.)  the employee's

immediate supervisor.

¶  89.  Because of the aggressive nature exhibited by Andretta,

Plaintiff felt as if she could not go to HR for fear of further retaliation

from Andretta.[29]

Accordingly, Counts I and II, as stated, fail to state a claim for retaliation.

They will be dismissed and Plaintiff will be allowed one opportunity to re-plead

her counts in an amended complaint.

## COUNT III: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS

The Commonwealth of Pennsylvania recognizes the common law tort of

intentional infliction of emotional distress as "one who by extreme and outrageous

conduct intentionally or recklessly causes severe emotional distress to another is

subject to liability for such emotional distress, and if bodily harm to the other

results from it, for such bodily harm."[30]  Courts are divided as to whether or not an

employee can bring an intentional infliction of emotional distress claim outside of

the worker's compensation context.  Pennsylvania's Worker's Compensation Act

provides that it the sole remedy for injuries sustained during employment.  Some

---

[29] ECF No. 16 at 12 paragraphs 87-89.
[30] *Britt v. Chestnut Hill Coll.*, 429 Pa. Super. 263, 272, 632 A.2d 557, 561 (1993) *citing* Restatement (Second) of Torts, § 46(1).

courts have held that this includes claims for intentional infliction of emotional distress.[31]   More frequently, however, federal courts have allowed the intentional infliction of emotional distress in the workplace claim to proceed alongside a Title VII claim.[32]

 The parties agree that the law in this area is unsettled.  Accordingly, I will not dismiss the claim as preempted by Pennsylvania statutory law, because a majority of District Courts, including this District, have permitted employee intentional infliction of emotional distress claims to proceed.

That said, I will dismiss the claim, with leave to amend, for not having alleged "extreme and outrageous" conduct. "The Pennsylvania Supreme Court has enunciated an objective standard for intentional infliction of emotional distress, permitting recovery only "where a reasonable person normally constituted would be unable to adequately cope with the mental stress engendered by the circumstances of the event."[33] "Generally, it is insufficient "that the defendant has

---

[31] *See, e.g., Smith v. Davis,* 248 F.3d 249, 253 (3d Cir. 2001) (citing to the district court's dismissal of the intentional infliction of emotional distress claim as preempted by the Worker's Compensation Act, while taking no position on the propriety of that decision, as it was not appealed by the plaintiff).

[32] *See e.g., Harper v. Misitano,* No. 1:15-CV-2205, 2016 WL 4429941, at *1 (M.D. Pa. Aug. 22, 2016) (Kane, J.)*; Russell v. City of Philadelphia,* No. CV 13-3151, 2016 WL 4478764, at *10 (E.D. Pa. Aug. 25, 2016) (Quinones Alejandro, J.);  *Despot v. Baltimore Life Ins. Co.*, No. CV 15-1672, 2016 WL 4148085, at *13 (W.D. Pa. June 28, 2016), report and recommendation adopted, No. CV 15-1672, 2016 WL 4141109 (W.D. Pa. Aug. 4, 2016) (Mitchell, M.J.),  *Cohen v. Chester Cty. Dep't of Mental Health/Intellectual Disabilities Servs.,* No. CV 15-5285, 2016 WL 3031719, at *14 (E.D. Pa. May 25, 2016) (DuBois, J.).

[33] *Russell*, 2016 WL 4478764, at *11, *citing Kazatsky v. King David Mem'l Park*, 527 A.2d 988, 993 (Pa. 1987).

acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort."[34] "Rather, recovery for the tort of intentional infliction of emotional distress [has been] reserved by the courts for only the most clearly desperate and ultra-extreme conduct...."[35] "It is for the court to determine, in the first instance, whether the actor's conduct can reasonably be regarded as so extreme and outrageous as to permit recovery."[36]

"It must be recognized that it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress."[37]  The Honorable Yvette Kane of this Court has stated,

> [A]s a general rule, sexual harassment alone does not rise to the level of outrageousness necessary to make out a cause of action for intentional infliction of emotional distress." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1487 (3d Cir. 1990).In fact, within the employment context, Pennsylvania courts have found conduct sufficiently outrageous "where an employer engaged in both sexual harassment and other retaliatory behavior against an employee." *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988) (emphasis added); *Hoy*, 720 A.2d at 153 (considering retaliation a "weighty factor"); *see Lee v. Comhar Inc.*, 244 Fed.Appx. 464, 467 (3d Cir.

---

[34] *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998).

[35] *Id.* at 754.

[36] *Russell*, at * 11.

[37] *Despot v. Baltimore Life Ins. Co*., No. CV 15-1672, 2016 WL 4148085, at *13 (W.D. Pa. June 28, 2016), report and recommendation adopted, No. CV 15-1672, 2016 WL 4141109 (W.D. Pa. Aug. 4, 2016)

2007). "The extra factor that is generally required is retaliation for turning down sexual propositions." *Andrews*, 895 F.2d at 1487.[38]

While I acknowledge that the alleged facts portray Michael Andretta as a misogynist bully who uses inappropriate and vulgar language, I do not find that Rorke's pleadings, as stated, rise to the level of extreme and outrageous conduct. She will be granted one opportunity to amend this count, as well.

## IV. CONCLUSION

For the foregoing reasons, the Motion to Dismiss under Rule 12(b)(6) is granted. Federal Rule of Civil Procedure 15(a) states that amendment should freely be given,[39] and I do not find that amendment here would be futile.  I will therefore allow Plaintiff one final opportunity to amend her complaint. An appropriate Order follows.


BY THE COURT:


/s Matthew W. Brann
Matthew W. Brann
United States District Judge


---

[38] Harper v. Misitano, No. 1:15-CV-2205, 2016 WL 4429941, at *3 (M.D. Pa. Aug. 22, 2016) (Kane, J.)
[39] *See Forman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1982).