# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KIM RORKE, | No. 4:16-CV-00219 |
| Plaintiff, | (Judge Brann) |
| v. | |
| AUBREY ALEXANDER TOYOTA and MICHAEL ANDRETTA, | |
| Defendants. | |

## MEMORANDUM OPINION

### JULY 10, 2019

## I.    BACKGROUND

When the Civil Rights Act of 1964 was passed, President Lyndon B. Johnson said at its signing: "This Civil Rights Act is a challenge to all of us to go to work in our communities and our States, in our homes and in our hearts, to eliminate the last vestiges of injustice in our beloved country."  The purpose of "Title VII is [] to help ensure equality in the workplace by removing barriers that have yielded systematic inequality in that setting." [1]  Fifty-five years after Title VII was enacted, this Court is faced with a high-level manager who was making near daily gratuitous sexual and misogynistic comments to his underlings at the auto

---

[1]    Henry L. Chambers, Jr., <u>The Supreme Court Chipping Away at Title VII: Strengthening It or Killing It?</u>, 74 La. L. Rev. 1161, 1163 (2014).

dealership location he managed, and business owners who, a jury may well find, allowed him to continue these acts unheeded.

## II. DISCUSSION

Plaintiff, Kim Rorke, hereinafter "Rorke," has invoked her rights under Title VII by filing a three-count employment discrimination complaint against her former employer, Aubrey Alexander Toyota, and against the general manager of the automobile dealership, Michael Andretta, hereinafter "Andretta." Discovery has concluded, and Defendants jointly filed a motion for summary judgment asking that final judgment be entered in their favor on all counts. The motion is now ripe for disposition; for the reasons that follow, it is denied.

### A. Standard of Review

I begin my analysis with the standard of review which undergirds summary judgment. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."[2] Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3] "Facts that could alter the outcome are 'material facts,' and disputes are 'genuine' if evidence exists from which a rational person could

---

[2] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[3] Fed. R. Civ. P. 56(a).

conclude that the position of the person with the burden of proof on the disputed issue is correct."[4] "A defendant meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[5] "A plaintiff, on the other hand, must point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[6]

"The inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."[7] Thus, "if the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."[8] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[9] "The judge's inquiry, therefore, unavoidably asks . . . 'whether there is [evidence] upon which a jury can properly proceed to find a

---

[4]   *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.) (*citing Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986) and *Celotex*, 477 U.S. at 322).

[5]   *Clark*, 9 F.3d at 326.

[6]   *Id*.

[7]   *Liberty Lobby, Inc*., 477 U.S. at 252.

[8]   *Id*.

[9]   *Id*.

verdict for the party producing it, upon whom the onus of proof is imposed.'"[10] The evidentiary record at trial, by rule, will typically never surpass that which was compiled during the course of discovery.

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[11] "Regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."[12]

Where the movant properly supports his motion, the nonmoving party, to avoid summary judgment, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[13] For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed" must be supported by:

---

[10] *Id. (quoting Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 447 (1871)).

[11] *Celotex*, 477 U.S. at 323 (internal quotations omitted).

[12] *Id.*

[13] *Liberty Lobby*, 477 U.S. at 250.

(i) "citing to particular parts of materials in the record" that go beyond "mere allegations"; (ii) "showing that the materials cited do not establish the absence or presence of a genuine dispute"; or (iii) "showing . . . that an adverse party cannot produce admissible evidence to support the fact."[14]

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"[15]   Moreover, "if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."[16]  On a motion for summary judgment, "the court need consider only the cited materials, but it may consider other materials in the record."[17]

Finally, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[18]   "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a

---

[14]   Fed. R. Civ. P. 56(c)(1).

[15]   *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003) (Weis, J.).

[16]   Fed. R. Civ. P. 56(e)(2).

[17]   Fed. R. Civ. P. 56(c)(3).

[18]   *Liberty Lobby*, 477 U.S. at 249.

verdict for that party."[19] "If the evidence is merely colorable . . . or is not significantly probative, summary judgment may be granted."[20]

## B. Undisputed Facts[21]

With that standard outlining the Court's framework for review, I now turn to the undisputed facts of this matter. Kim Rorke was employed as a sales consultant for Aubrey Alexander Toyota for almost six years.[22] Rorke testified that her "job went smoothly" during the tenure of her previous manager, John Broome. During that time she "enjoyed going to work every day," "didn't feel any pressure," "didn't feel any stress," was generally "happy to go to work."[23]

### 1. General Manager Mike Andretta

However, when Defendant Michael "Mike" Andretta became the general manager, things changed for Rorke. She had heard rumors[24] that Andretta would join Aubrey Alexander Toyota as the general manager and she testified that although "we didn't know was what was going to happen, [] he was known to be kind of a jerk in the community."[25] She knew him to be a "bold [] bully."[26]

---

[19] *Id.*

[20] *Id.* at 249–50 (internal citations omitted).

[21] *See* Defendant's Statement of Facts, April 2, 2019, ECF No. 64 and Plaintiff's Answer to Statement of Facts, May 21, 2019, ECF No. 70.

[22] From August 2008 to February 9, 2015.

[23] Plaintiff's Deposition Transcript, ECF No. 64-1 at 54:18-21.

[24] *Id* at 55-56.

[25] *Id.* at 56.

[26] *Id.* at 57.

She further testified that "after he was there a couple months, that's when he started turning into the jerk, the power, the ego…it was almost like he was bipolar or something."[27]  In describing Andretta's aggressive behavior, she explained that he would use sexual language, referring to both male and female sales consultants, calling them "assclowns"[28] and "dickheads"[29] snapping at them to "grow a set of balls."[30]  He would also frequently use expletives in his directives saying things such as: "I run this fucking place."[31] "Which one of you fucking assclowns did this?"[32] "Did I tell you [that] you could go the fuck home?"[33] "Wake the fuck up."[34] "What the fuck is wrong with you?"[35]  In the presence of an African-American employee, he described an employee as "nigger rich."[36]  He would also describe one employee's attire as "retarded."[37]  Not only did Andretta use aggressive language, Rorke also witnessed Andretta physically "pick [another employee, Dennis Christiana] up by the shirt and just thr[o]w him out the door."[38]

---

[27]   *Id.* at 159:18-21.

[28]   *Id.* at 181.

[29]   *Id.* at 170.

[30]   *Id.* at 182.

[31]   *Id.* at 140.

[32]   *Id.* at 168.

[33]   *Id.*

[34]   *Id.*

[35]   *Id.*

[36]   *Id.* at 173-4.

[37]   *Id.* at 190.

[38]   *Id.* at 221.

She further testified that Andretta was "obsessed" with discussing the sex lives of the male employees. She testified, "He had a thing about talking about everybody's sex life. Don't ask me why, but he loved to do that in the morning meetings."[39] She felt like Andretta was "trying to live" through a male employee, Rick Shover, asking the gentleman "whose house are you sleeping at tonight, your wife's or your girlfriend's?"[40]

Andretta would use the acronym, 'POTP,' which Rorke initially did not understand.[41] She testified that Andretta was the only male at the dealership who would use the phrase 'POTP.'[42] Rorke testified that one time she was waiting behind another sales person, Matt Burd, to talk to Andretta, who said to Burd, "Well I can tell you what's wrong down there, there's too much POTP."[43] At that point, Rorke didn't know the meaning, of 'POTP,' so she asked Andretta what it meant, and she testified that "he looked at me and said, 'Don't worry, you have plenty of it.'"[44] She later asked another sales person, Chad Scholl what it meant, and Scholl initially did not want to explain the meaning to her. He ultimately told her it meant 'power of the pussy.'[45]

---

[39]   *Id.* at 111.

[40]   *Id.* at 171.

[41]   *Id.* at 110-112.

[42]   *Id*. at 172-3.

[43]   *Id.* at 106.

[44]   *Id.*

[45]   *Id.*

She continued her testimony lamenting, "That was the most humiliating moment of my life…I was embarrassed.  And [Andretta] used that term quite often then afterwards."[46] After this incident, she heard him use the term 'POTP' several times, but she estimated it was less than ten times.[47]

Andretta would often make misogynistic, inappropriate comments about or toward females, including calling them "Toots."[48]  He described his own wife, and another employee, Bryan Sage's wife as "crazy bitches."[49]  He told another female employee that she looked "like a hooker."[50]  He would make a concerted effort to make another female cry.[51]  Andretta used the loudspeaker to page female employee, Shannon Fink, referring to her only as "Pop Tart."[52]  A male employee reported to Rorke that he overheard Andretta say that he would "never hire another woman in the sales department again."[53]

---

[46]  *Id.*

[47]  *Id.* at 110.

[48]  *Id.* at 144.

[49]  *Id.* at 180,

[50]  *Id.* at 213.

[51]  *Id.* at 224.  Rorke testified that, in fact, Andretta did succeed in making herself, several female employees, and one male employee, cry.

[52]  *Id.* at 209-10.  A derogatory term for a female.

[53]  *Id.* at 215.

### 2. Rorke's Salary Structure

In regard to asserted issues with her salary, Rorke testified that when she "first started [she] was a hundred percent commission with a draw."[54] She further testified that "they have changed their pay scale so many times."[55] Sometime around December 2008, another manager told Rorke that she would no longer have to pay back her draws.[56] The way she understood it was that some employees did have the pay back the draws and some didn't.[57] Then in January 2015, Andretta told all sales consultants that a new pay plan was going into effect; for people who sold "20 or 25 cars" they could keep the draw.[58]

### 3. Rorke's Work Schedule

Rorke testified, "I can't remember what my day off was in the beginning. When I ended there, my days off were Saturday. But in the beginning, my day off was a weekday."[59]

---

[54]   *Id.* at 43.

[55]   *Id.* at 44.

[56]   *Id.* at 47.

[57]   *Id.* at 46-8.

[58]   *Id.* at 132.

[59]   *Id.* at 45.

### 4. Rorke's Denied Vacation Request

Rorke testified that she was denied a vacation request because Andretta tried to "bully her."[60]  She explained that in December[61] she went to Andretta with a vacation request for May, and he said to her, "Why are you bothering me for this shit, it's in May?"[62] And he crumpled the paper and threw it down.[63]  She "filled it out and then again, and..asked him maybe the next day or two days later and then it was approved."[64]

### 5. Rorke's Unused Vacation Time Payout

The business would pay employees for their unused vacation days.  Rorke went to Andretta sometime in January 2015 and the following exchange occurred, according to Rorke's testimony:

> So I went in and asked him like I always do when I'm entitled to it, can I cash in my – I put a written notice in – can I cash my two weeks and gave it to him.
>
> And he looked at it and read it, you know, said a few ignorant things, you know.  He said, You're not getting it this way.  I said, Well, what do you mean, I'm entitled to it?  He said, Yeah, he said, I'm going to make you wait to quit.

*****

---

[60]  *Id.* at 121.

[61]  Year unknown.

[62]  *Id.* at 120.

[63]  *Id.*

[64]  *Id.* at 122.

And anyway, to get back to the story, he said, You're going to have to stay, he said, another month. I'm going to make you suffer another month. I'm not giving you both weeks. I'm going to pay you one week in January, one week in February.

Why was that? The policy was that I could get my pay in two weeks if that's what I had coming, and I did. I didn't get it. So he paid me – I had to do that. He paid me one week in January and then February the first Friday it would have been, whatever day we would have got our paychecks, I would have gotten an extra paycheck for my second week vacation.[65]

On one previous occasion, Rorke had asked for two weeks of vacation pay to be paid at once. That request was granted.[66]

### 6. The Employee Handbook/Grievance Procedures

Rorke testified that she received the Blaise Alexander Family Dealerships Employee Handbook when she began employment with the dealership, and she further testified that she was unaware of any changes to it during her tenure.[67]

### 7. Rorke's Resignation on February 9, 2015

Rorke testified that on the day of her resignation, Andretta was "in a foul mood."[68] She elaborated:

And he came in and took his watch off right away. And that was a sign of intimidation. He wore a Rolex watch, and if he'd be upset, he would take that off and throw it down and that was like stay away from me.

So he came in. He wasn't, I don't believe he was in the morning meeting. And he was just on everybody that day. And Dennis

---

[65] *Id.* at 125-6.

[66] *Id.* at 127.

[67] *Id.* at 49-51.

[68] *Id.* at 68.

Christiana, who was one of the sales managers, came to me and said that a customer that I had been working for a long time, like I had two year' worth of notes in our auto base system, wanted me to give him a call that he was ready to do something.

So I said, Okay. And then like a couple minutes later Dennis came back and said, Never mind, don't' contact him, he already bought a car. And I said, Really, where did he buy a car? Just a common question. And he said, Here. And I said, What do you mean here? And he said, Yeah, he came in on Saturday and bought one on Saturday.

Now, the common practice is if you had somebody in the auto base system and they're documented and they come in on your day off and someone delivers the car and spends time with them, it was a split deal, meaning they got half of the commission. I got half of the commission. And at that point I think we even got a half of what we call strokes and strokes earned us bonuses.

So I said, Well, why wasn't I compensated, you know, why didn't anyone come and tell me? Because that was the protocol. I said, You got an email, the guy was asking for me. Nothing was said. Well, it was Mike's day off Saturday.

So I went up to Mike and he got real agitated about it and he said, Don't worry about it. He said, I'll give you another lead or I'll make it up to you. Meaning he give me a spoon, which meant if somebody came in and asked for him, he'd hand them off to me. I said Okay.

So I thought about it a little bit more about it and I went back and I followed the trail of all of these two years. And the more I went down the trail, the more angry I got because I worked hard for that customer. I went out and asked him for it and he just threw a fit and said something like if you were here Saturday, you would have been able to sell that car. And I said, Mike, it was my day off. I'm entitled to a day off.

I worked 60 hours almost. I worked, at that point I was working Monday through Friday for him with no day off and he gave me Saturdays off. Which kind of backfired on him because he really didn't think I would want Saturdays off.

That all came about because one day he was saying I need extra people here on a Thursday, which was my day off. And I said, I'll work. And he said, But, and I said, But, and he goes, Done. And I said, What do you mean done? He goes, Don't say another word. You want Saturdays off. I know you want Saturday off. Because I had grandchildren and I wanted to be – visit them. They lived in Mechanicsburg. And he said, Done. I said, Great, thank you.

I think he thought it was going to bug me that I was off Saturday when it was busy day and was missing some sales. Honestly, I was happy to spend the time with my grandchildren. I still made a good living.

So I said, That's not fair, that was my day off. Just like if what would have been the difference if they would have came in on a Thursday when it was my day off?[69]

*****

And at that point the floor was over-crowded, okay, there was a bunch of sales people so we didn't have enough desks per salespeople. So he moved me and my son to share I say [sic] office, but it was a little room, you know, that we shared in there.

He followed me into there and he started, you know, on me about different things. And I said, you know, about – we got into a discussion about how he didn't really treat me right.

There were times when I asked him, and I brought this up to him, I said just like, you know, every other woman was allowed to park right outside the door in the parking lot, but me and Shannon had to walk in the dark down to the other end of a road to a very dark woods by the woods lot to park our cars. And I said, You don't really care, I mean just like why can't I park up here? And he said, No reason, you're in sales.

And I said, Well, how would you like it if your wife had to walk like that? And his answer to me was, I'd make her walk twice as far. And I said, Hum you probably would.

---

[69] *Id.* at 69-72

We got into a discussion about different things and he kept getting louder and louder. And he said to me, Your day off is no longer Saturday, pick another day off. I looked at him and I said, You know what – it was my breaking point. I just, you know, even when you're in an abusive relationship, you take it, you take it, you take it, and then one day it just comes to a head and you can't take it anymore.

I said, You know what, I will pick a day off. I want Sunday, Monday, Tuesday, Wednesday, Thursday, Friday, Saturday off. He looked and me and he said, What? I said, Yeah, I'm quitting. I can't take you any longer. He said, You're going to be sorry. He said, You – his exact words to me were, You need me more than I need you. And I said, Really?[70]

She testified that "This built up, built up and built up."[71] "And you know, you just can't take it after there, the pressure every day of going to work and being on egg shells is unbelievable."[72]

### 8. Rorke's reasons for not reporting Andretta

Rorke testified that she never complained to any other supervisors nor the owner of the dealership about Andretta's behavior. She explained "Well, because of being threatened all the time. I mean if I go to him and go over his head and get that and come back, I went through hell without going over his head. I just couldn't even imagine what my life would have been like going to work there every day working for him and going over his head. I was afraid."[73] She continued, "I feared

---

[70] *Id.* at 74-5.

[71] *Id.* at 12.

[72] *Id.* at 80.

[73] *Id.* at 138.

for my job.  I needed my job.  I was going to build a $350,000 home.  I wasn't going to do it on my husband's income.  I had been there six and a half years.  I had to stay there, okay.  I was afraid to go to anyone."[74]

She further testified that there was a prior employee who had complained about Andretta, and nothing was done about Andretta.[75]  She believed the Alexander family and other managers knew about Andretta's behavior and chose to willfully ignore it.[76]

### 9.    Deposition Testimony of Michael Andretta

Andretta testified that he was General Manager of the Aubrey Alexander Toyota dealership from April 30, 2012 till he was "released from his duties for performance reasons" on January 2, 2019.[77]  He testified that Rorke's performance was "terrific" prior to the change in the pay plan.[78]  He explained that "she did a great job and reaped the benefits, i.e., no Saturdays, i.e., her own office.  None of the other male counterparts had [that.]"[79]  He testified that he did not want Rorke to quit, stating "she was a top performer, top 25, you don't fuck with that."[80]  He

---

[74]  *Id.* at 264.

[75]  *Id.* at 247.

[76]  *Id.* at 247 and 255.

[77]  ECF No. 64-3.

[78]  *Id*.

[79]  *Id.*

[80]  *Id.*

testified that after Rorke quit, her husband came into the dealership to "confront" Andretta and was "very loud and obnoxious in the showroom."[81]

Andretta testified that the only disagreement he had with Rorke was "when her pay plan got changed, as well as everyone else's at the same time."[82] He said her attitude toward him changed, saying "I went from being the greatest guy in the world, knowing what I'm doing, making her more money than she ever had, to being the worst person in the world, all in a matter of a week."[83] He explained the pay plan changed for everyone:

> That happened the first couple days of January 2015.
>
> \*\*\*\*\*
>
> Well, I had to – because we were a volume store, I just about doubled the volume since I started there and we needed to tweak the pay plans, which is a common thing in the car business.
>
> \*\*\*\*\*
>
> They changed – Ms. Rorke, at the time, was the only one who kept her draw, which is a weekly allowance that they were given that they pay back against their commissions at the end of the month. She needed to sell ten cars – this was when she was hired. And when we all sat down in the first couple days of January everybody was offered to keep their draw at 25 cars per month, including Ms. Rorke.
>
> \*\*\*\*\*
>
> She kept two managers and myself after the meeting and expletively [sic] reamed us out, about who do we think we f-ing think we are. I

---

[81] *Id.*

[82] *Id.*

[83] *Id.*

keep my draws. I said: You don't keep your draws, there's a minimum you need to sell. Well, I don't think I have to sell 25 cars. So after probably ten minutes of going back and forth, her pay plan we agreed upon, she needed to sell 20.[84]

Andretta testified that "everything was okay" with Rorke "until she had a panic attack" about delivering a car to a customer.[85] Andretta testified that it is "standard procedure" in the car business for sales people to personally deliver cars to customers.[86] However, he testified that Rorke's attack was because "she was delivering a car to Fenton, PA and she contacted another salesperson that she was having a panic attack and needed to be picked up immediately."[87]

Andretta testified that he only "occasionally" used profanity; never humiliated Mr. Catlin nor made fun of his sexual orientation at the morning meetings; and only asked Catlin if he "showered with his ex-wife and his girlfriend at the same time" in a "different setting where there was no females around."[88] Andretta denied having ever physically grabbing Dennis Christiana.[89]

Andretta did acknowledge calling Brian Sage's wife a "crazy bitch," but he didn't think he said it front of Rorke.[90] However, he described Rorke as a "sailor

---

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] *Id.*

[89] *Id.*

[90] *Id.*

along with the boys," meaning that she, along with the male sales people, "had a sailors mouth" using "profanity on a regular [] basis."[91]   Andretta acknowledged telling the male sales associates to "grow a set of balls," but that he would not say it to the females.[92]   He testified that he never asked Rick Shover "which family got the Weis gift card, the white family or the black family."[93]   However, Andretta did acknowledge that he asked Shover, "Who did you sleep with last night, your wife or girlfriend?"[94]   Andretta also acknowledged having used the "n-word" in front of the sales staff.[95]

Andretta denied ever having said that he would "never hire another woman in the sales department again."[96] Andretta also testified that he never called Shannon Fink a "Pop-Tart;" that Ashley Frye Martinez had given Fink that nick name; and it does not have a sexual connotation.[97]   Andretta acknowledged sending Fink to the mall to buy a new shirt because her shirt was "inappropriate" because "it was a low-cut top."[98]   Andretta also testified that although sometimes

---

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] *Id.*

[98] *Id.*

after work he'd ask Ashley Frye Martinez to make a "run" for alcohol, she always offered to mix the drinks for him, but he didn't ask her to do that.[99]

Andretta acknowledged calling Rorke "Toots," he said it was "a nickname she had. All called her Toots."[100]

Andretta denied refusing and tearing up a vacation request from Rorke.[101] He testified that he "handed it back to her when I said I was busy, I would get to it later…Several days later, I believe it was, I approved it"[102]

He also explained permitting Rorke to have Saturdays off was unusual. He said that "In the car business that is unheard of, not to have to work Saturdays, in a sales position…Saturday is your bread and butter day of the week. That's when most people that work a normal job have off and they come out and look for a car."[103] But he described Rorke as having "demanded that she have Saturdays off so she could spend time with her grandchildren."[104]

Finally, Andretta did acknowledge using the term "POTP" to the sales staff, and he confirmed that it meant "power of the pussy."[105] He further elaborated that

---

[99] *Id.*

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] *Id.*

[104] *Id.*

[105] *Id.*

it mean that "women have the power in a car deal."[106]  He denied having told

Rorke that she had "plenty of it."[107]

### 10.    Deposition Testimony of Ashley Frye Martinez

Plaintiff's counsel deposed a former employee, Ashley Frye Martinez.

Martinez testified that several people complained to her about Andretta's behavior,

although the employee's assessment of him seemed to be mixed.  When asked who

complained about him, she testified:

> I couldn't say[,] that in finance there was definitely times that Joe and
> Brian would be upset.  And in sales it would depend on the day.  If Mike
> was helping them sell a lot of cars then everybody was happy with him.
> And if he asked them to do something and they didn't see that that was
> what they needed to be doing, then they would have gripes about him.
> So it would kind of day-to-day switch.[108]

Martinez further testified that Andretta did not say anything to her, nor did

she witness him say anything to others, that she found to be sexually offensive.[109]

However, she later testified that she did hear him and others use the term POTP.[110]

She understood it to mean "if your wife or girlfriend was nagging, I guess, it was

because of the POTP."[111]

---

[106] *Id.*

[107] *Id.*

[108]  ECF No. 64-2.

[109] *Id.*

[110] *Id.*

[111] *Id.*

Martinez acknowledged that there were times Andretta made her cry at work, but she qualified her answer, saying "But I was dealing with a lot of personal things in my life at that time, so it's hard to say if it was Mike or if it was my abusive relationship that I was in."[112]  She testified that she would cry at work "probably a couple times a week.  I was very stressed at that time."[113]  She testified that although she did have an anxiety attack at work and had to leave, it was not caused by Andretta.

Andretta did occasionally ask her, after hours, to make him a hot toddy or bring him a beer.   When asked why he didn't ask others to make the drink for him, she responded, "I always offered.  It was never really discussed.  He would make them or I would make them.  It wasn't told, I guess."[114]

Additionally, Martinez acknowledged that she also called a fellow employee, Shannon Fink, a Pop-Tart, "because she was very flaky."[115]  She doesn't remember if Andretta called Fink that or not.[116]

---

[112]  *Id.*

[113]  *Id.*

[114]  *Id.*

[115]  *Id.*

[116]  *Id.*

## 11.     Deposition Testimony of Bryan Sage

Another former employee, Bryan Sage, was deposed.[117]  Sage worked as the finance manager for Aubrey Alexander Toyota for approximately five years.[118] Sage started with the business the same day Andretta did and attended all the sales meetings.[119]  Andretta was Sage's direct supervisor, and Sage testified that they "did not get along at all.  You know there – there were days where we wouldn't even speak to each other, even though, you know, my – work station was within arm's reach of him.  We – we did not get along.  We – we were not friends.  We were not – you know, he was my boss and I was his employee, so to speak."[120]

When asked to describe Andretta's treatment of women, Sage replied: "You know he – it depended on who they – I – I've seen him treat, you know, certain women very well and then other women he did not treat very well."[121]  Sage said that Andretta would refer to Shannon Fink as a Pop Tart "daily" and "hooker" on two or three occasions.[122]  Sage said he never heard Andretta refer to Fink by her name, and even paged her over the intercom system calling for "Pop Tart."[123]  Sage testified that Ashley Frye Martinez went through several difficult personal

---

[117]  ECF No. 69-5.

[118]  *Id.*

[119]  *Id.*

[120]  *Id.*

[121]  *Id.*

[122]  *Id.*

[123]  *Id.*

circumstances, and that she would cry at work almost daily, and that Andretta would make concerted efforts to make her cry.[124]  In fact, Andretta would organize betting pools for him and certain other employees to take bets on how many hours in the workday would elapse before Martinez cried.[125]

Sage also witnessed Andretta and Rorke's interactions daily, and described those as follows:  "He – you know, he – he treated Kim basically the same as – as he treated a lot of people.  He – I – I wouldn't say that he – he was an equal opportunity jerk, so to speak, so I don't – I wouldn't say that Kim was treated worse than anyone else, but there were times that definitely Kim was talked to in a, you know, unprofessional manner."[126]   Sage testified that Andretta would offend Rorke "at least on a daily to a multiple times a week."[127]

Sage testified that he heard Andretta use the acronym POTP "multiple times" and confirmed that it stands for 'power of the pussy.'[128]  Sage further testified that Andretta told multiple employees to "get[] good at sucking dick, so that way you'd have something warm in your belly in the unemployment line."  When asked if Sage could remember if Andretta made this comment in the

---

[124]  *Id.*

[125]  *Id.*

[126]  *Id.*

[127]  *Id.*

[128]  *Id.*

presence of Rorke, Sage replied, " if my memory is correct, you know, there is a 90, 95 percent chance that yes."

Sage explained that Andretta also made negative references to Sage's wife "on almost a daily basis."[129]  Andretta would call Sage's wife a "bitch, dumb bitch, [and] stupid" around female employees, including Rorke.  Sage explained that after he briefly left Aubrey Alexander Toyota and was working for a competitor, he asked Rorke to ask Andretta if Sage could return to his employment.  Andretta replied, "I'll bring him back if – if, you know, he doesn't let that dumb bitch control his life."[130]  Sage testified that Andretta would make comments about Sage's wife in front of "Kim Rorke, Ashley Martinez, even Terry Stauffer – the HR rep."[131]

### 12. Deposition Testimony of Dennis Christiana

Another former employee, Dennis Christiana, the sales manager/customer relations manager, was also deposed.[132]  Andretta was Christiana's direct supervisor, and he said they "got along [] pretty well."[133]  Christiana testified that

---

[129] *Id.*

[130] *Id.*

[131] *Id.*

[132] ECF No. 69-6.

[133] *Id.*

the incident where Andretta shoved him out of the door was not a serious altercation or fight, but "it was more of a playing around."[134]

Christiana also heard Andretta use the term "POTP" and confirmed its meaning.[135] Christiana also confirmed that Andretta would call Shannon Fink "Pop Tart."[136]

Christiana also discussed the change in pay that went into effect for everyone. When the pay change went into effect Christiana testified that "we made it a level playing field that every sales person had the same sales plan that when you hit I think it was 20 cars you got to keep your draw."[137] He continued, "that's where it changed for Kim. When she lost that 10 cars and had to sell 20 cars to keep her draw…that was I think the turning point for Kim …and Kim was selling 20 cars. So to me I didn't understand – what the – I guess what the big deal was."[138]

### 13.    Deposition Testimony of Kyle Reigle

Kyle Reigle is currently employed by Aubrey Alexander Toyota as a sales specialist.[139] Reigle said he got along well with Rorke, but that Andretta did not.

---

[134] *Id.*

[135] *Id.*

[136] *Id.*

[137] *Id.*

[138] *Id.*

[139] ECF No. 69-7.

Reigle said that Andretta would frequently use the term "power of the pussy," along with the acronym "POTP," and would frequently do so in Rorke's presence. Reigle also testified that he heard Andretta refer to Bryan Sage's wife as a "crazy bitch."[140] Reigle heard Andretta call Shannon Fink a 'Pop Tart,' and explained "I think it had something to do with her being a stripper."[141] Reigle testified that Rorke and he were both present when Andretta asked Rick Shover 'who he slept with the prior night, his wife or girlfriend'.[142] Reigle also testified that he had heard Andretta say that he would never hire another woman in the sales department again.[143]

Reigle also did not agree with Christiana's description of the encounter between Christiana and Andretta. Reigle testified "Mike Andretta and Dennis were fighting and yelling back and forth at each other and Mike Andretta pushed him out of the back door in the back hallway to go out to the back lot."[144]

Finally, Reigle testified that he had heard that another employee, Matt Barto, "went above and spoke to the owners about how things were and now he works for our other store and he is doing great."[145]

---

[140] *Id.*

[141] *Id.*

[142] *Id.*

[143] *Id.*

[144] *Id.*

[145] *Id.*

### 14.    Deposition Testimony of Terry Stauffer

Terry Stauffer has been the office manager for Aubrey Alexander Toyota since 1994.[146]  Stauffer worked "fairly closely" with Andretta, who was Stauffer's direct supervisor.[147]   Stauffer described Andretta as "gruff" but never heard Andretta use the term 'POTP.'[148]

### 15.    Deposition Testimony of Chad Scholl

Chad Scholl has worked for Aubrey Alexander Toyota since 2011, first as a sales person, and currently as a team leader.[149]  Scholl testified that everyone got along with Rorke, including Andretta "for a period of time."[150]  Scholl heard Andretta use the term 'POTP' "quite a few times" including in front of Rorke.[151] Scholl knew the term to mean that "women have the power of the pussy."[152] Scholl heard Andretta call Shannon Fink a 'Pop Tart' on a "daily basis" as a "stripper name."[153]

---

[146]  ECF No. 69-8.

[147]  *Id.*

[148]  *Id.*

[149]  ECF No. 69-9.

[150]  *Id.*

[151]  *Id.*

[152]  *Id.*

[153]  *Id.*

Scholl also heard Andretta ask Rick Shover 'which family got the gift card — the white family or the black family.'[154]

Scholl left the dealership in November 2018. He testified that Blaise Alexander called him in December 2018, and Scholl explained that he left because of Andretta's behavior. Scholl testified that Blaise Alexander "did not seem surprised" to hear about Andretta's behavior, because Scholl "heard through the grapevine that he spoke to Matt Barto [] as well."[155]

### 16.    Deposition Testimony of Matt Burd

Matt Burd has been the sales manager for Aubrey Alexander Toyota for the past ten years.[156] During Andretta's tenure, Andretta was Burd's direct supervisor. He did not hear Andretta use the term 'POTP,' but did hear Andretta call Shannon Fink a 'Pop Tart.'[157] Burd also heard Andretta call Bryan Sage's wife a 'bitch.'[158]

Burd further testified that the decision-making authority to change the employee's pay plan was "Mike's [Andretta's] idea."[159]

---

[154] *Id.*

[155] *Id.*

[156] ECF No. 69-10.

[157] *Id.*

[158] *Id.*

[159] *Id.*

### 17. The Employee Handbook

Finally, the dealership does have a twenty-seven employee handbook applicable to all of its dealership locations.[160]  Three pages of the handbook are dedicated to "Discriminatory Harassment."[161]  There is a reporting system listed in the handbook and employees are offered "multiple complaint alternatives" so that they are "comfortable making such a report."[162]  "Employees may report discriminatory harassment to any of the following Company representatives: Blaise Alexander; [the] General Manager of the Dealership; [and] Your Immediate Supervisor."[163]  Just prior to this list, in bold, the handbook states: "It is absolutely necessary that you inform the Company immediately if you experience or observe any discriminatory harassment."[164]  Rorke signed an acknowledgment on August 4, 2008 that she received the employee handbook.[165]

### C. Analysis

Rorke has brought three, necessarily intertwined, causes of action; and Defendants Aubrey Alexander Toyota and Andretta raise one affirmative defense.

---

[160]  *See* ECF No. 64-6.

[161]  *Id.* at 4.

[162]  *Id*. at 6.

[163]  *Id.*

[164]  *Id.*

[165]  ECF No. 64-7.

Rorke bring claims of disparate treatment theory of gender discrimination,[166] the hostile work environment theory of gender discrimination,[167] and a claim under the Pennsylvania Human Relations Act "PHRA." It is well-settled that "[c]laims under the PHRA are interpreted coextensively with Title VII claims."[168] Defendants raise the affirmative defense provided by the United States Supreme Court decisions *Ellerth/Faragher*, *infra*.[169]

---

[166] "The archetypal claim of discrimination in violation of Title VII is a claim of 'disparate treatment,' which occurs when an employer treats some employees less favorably than others because of their gender." *Desouza v. Office of Children & Family Servs.*, No. 18-CV-2463-PKC-SMG, 2019 WL 2477796, at *3 (E.D.N.Y. June 12, 2019) (Chen, J.) *see also United States v. Brennan*, 650 F.3d 65, 89–90 (2d Cir. 2011); *quoting Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).

[167] "In addition to disparate treatment, the Supreme Court has recognized that *quid pro quo* sexual harassment and hostile work environment are forms of gender discrimination prohibited by Title VII, and such practices furnish independent causes of action." *Desouza* at *3, *See also Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012) ("[I]t is established 'without question, that when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor discriminates on the basis of sex.'" (*quoting Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) (alterations omitted))); *see also Vinson*, 577 U.S. at 65 ("[S]exual misconduct constitutes prohibited 'sexual harassment,' whether or not it is directly linked to the grant or denial of an economic *quid pro quo*, where 'such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.'" (*quoting* 29 C.F.R. § 1604.11(a)(3))).

[168] *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 (3d Cir. 2006), *and see Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir.1996).

[169] The United States Supreme Court has explained:

> When an official act does not underlie the constructive discharge, the *Ellerth* and *Faragher* analysis, we here hold, calls for extension of the affirmative defense to the employer. As those leading decisions indicate, official directions and declarations are the acts most likely to be brought home to the employer, the measures over which the employer can exercise greatest control. *See Ellerth*, 524 U.S., at 762, 118 S.Ct. 2257. Absent "an official act of the enterprise," *ibid.*, as the last straw, the employer ordinarily would have no particular reason to suspect that a resignation is not the typical kind daily occurring in the work force. And as *Ellerth* and *Faragher* further point out, an official act reflected in company records—a demotion or a reduction in compensation, for example—shows "beyond question" that the supervisor has used

### 1.	Disparate Treatment Theory of Gender Discrimination

Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, provides

that "[i]t shall be an unlawful employment practice . . . to discriminate against any

individual . . . because of . . . sex."[170]	Here, Rorke is asserting the disparate

treatment theory of gender discrimination.[171]	Under the familiar *McDonnell*

*Douglas* mode of analysis, the tripartite standard employed is that first, the plaintiff

must establish a *prima facie* case; second, the defendant must articulate some

legitimate, nondiscriminatory reason for the employment action; and third, the

plaintiff must then prove that the defendant's reason was a mere pretext for

discrimination.[172]

### a.	Prima Face Case of Discrimination

The *prima facie* elements of gender discrimination are four-fold: (1) she is a

member of a protected class; (2) she was qualified for the position; (3) she suffered

an adverse employment action; (4) the adverse employment action occurred under

---

his managerial or controlling position to the employee's disadvantage. *See Ellerth*, 524 U.S., at 760, 118 S.Ct. 2257. Absent such an official act, the extent to which the supervisor's misconduct has been aided by the agency relation, as we earlier recounted, *see* \*149 *supra*, at 2353, is less certain. That uncertainty, our precedent establishes, *see supra*, at 2353–2354, justifies affording the employer the chance to establish, through the *Ellerth/Faragher* affirmative defense, that it should not be held vicariously liable.

*Pennsylvania State Police v. Suders*, 542 U.S. 129, 148–49 (2004).

[170]	42 U.S.C. § 2000e 2(a)(1).

[171]	Pl. Opposing Br. ECF No. 69 at 4.

[172]	*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

circumstances that give rise to an inference of unlawful discrimination.[173]    With this analysis, the focus "is always whether the employer is treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'"[174]  Therefore, the plaintiff must produce "sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII."[175] This determination is question of law to be made by the court.[176]

Defendants in this matter do not dispute the first three elements.[177] Consequently, my analysis only concerns whether or not Rorke suffered an 'adverse employment action under circumstances that give rise to an inference of unlawful discrimination.'  Although there are several adverse employment actions that may give rise to an inference of discrimination, only one is necessary to survive the instant motion for summary judgment. Therefore, the Court will conserve judicial resources and focus on what I view as the actions most damning to Defendants.

---

[173] *See, e.g., Wooler v. Citizens Bank*, 274 Fed. App'x 177, 180 (3d Cir. 2008) (*citing Texas Dep't of Cmty. Affairs v. Burdline*, 450 U.S. 248, 253 (1981)).

[174] *Pivirotto v. Innovative Sys., Inc.,* 191 F.3d 344, 352 (3d Cir. 1999) (*quoting Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

[175] *Iadimarco v. Runyon,* 190 F.3d 151, 161 (3d Cir. 1999).

[176] *Willis v. UPMC Children's Hosp. of Pittsburgh,* 808 F.3d 638 (3d Cir. 2015).

[177] Def. Supporting Br. ECF No. 65 at 14.

The testimony clearly demonstrated that since the year 2008, Rorke enjoyed a benefit that other sales people did not – she was able to retain her monthly commission draw if she sold a mere ten cars per month.[178]  This was a salary decision made by Andretta's predecessor.[179]  However, in January 2015, Andretta changed the salary structure across the board for all employees so that the sales persons could only keep their draw if they sold 25 cars per month.[180]  Deposition testimony confirmed that the decision to change the salary plan was Andretta's "idea."[181]

I digress briefly from Rorke's burden to set forth a prima facie case of discrimination and turn now to Defendant's burden to set forth a 'legitimate non-discriminatory reason' for its actions.  A defendant's burden at this stage of the *McDonnell Douglas* framework is "'relatively light,' and the employer need only 'introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision.'"[182]  The employer's burden is satisfied by simply explaining its actions

---

[178]  ECF No. 64-1 at 47.

[179]  *Id.*

[180]  *Id.* at 132.   Rorke ultimately negotiated that number down from 25 to 20.

[181]  ECF No. 69-10.

[182]  *Tomasso v. Boeing Co.,* 445 F.3d 702, 706 (3d Cir. 2006) (*citing Fuentes v. Perskie,* 32 F.3d 759 (3d Cir. 1994.)).

or producing evidence of a legitimate nondiscriminatory reason.[183]  This burden is merely one of production, not one of persuasion.[184]

In the matter at hand, this burden was easily satisfied, as both Andretta and Dennis Christiana testified that the pay plan changed for all employees.  Andretta said "her [Rorke's] pay plan got changed, as well as everyone else's at the same time."[185]  Dennis Christiana explained that "we made it a level playing field that every sales person had the same sales plan that when you hit I think it was 20 cars you got to keep your draw."[186]

Because "the prima facie case and pretext inquiries often overlap; [] the court may skip the analysis of a plaintiff's prima facie case and proceed directly to the evaluation of pretext if the defendant offers a nondiscriminatory explanation for its employment decision."[187]  "At trial, the plaintiff must convince the finder of fact 'both that the reason was false, and that the discrimination was the real reason.'"[188]  "Plaintiff cannot simply show that the employer's decision was wrong or mistaken. . .rather, the nonmoving plaintiff must demonstrate such weakness,

---

[183]  *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 245, 255 (1981).

[184]  *See id.* at 256-258.

[185]  ECF No. 64-3.

[186]  ECF No. 69-6.

[187]  *Leong v. SAP Am., Inc.,* 67 F. Supp. 3d 972, 980 (N.D. Ill. 2014), *see also Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 664 (7th Cir.2011).

[188]  *Id.* at 412-413 (*citing St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original).

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence."[189] "Plaintiff also may survive summary judgment by pointing to evidence in the record which "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."[190]

I find that Rorke has met her burden at this stage of the litigation and the matter will be held over for trial. The record is replete with evidence that Andretta intentionally antagonized women.[191] The question for the jury will be whether the motivation behind the pay structure change (and Rorke's other alleged adverse employment actions) was really intended as an across the board policy, or if, because Rorke was the sole employee at the time who benefitted prior to the policy change (and was affected detrimentally after the policy change) this was yet

---

[189] *Fuentes v. Perskis*, 32 F.3d 759, 765 (3d Cir. 1994).

[190] *Jones,* 198 F.3d at 413 (*citing Fuent*es, 32 F.3d at 764)

[191] Andretta told Rorke she had "plenty of" the power of the pussy ECF No.64-1 at 106; Andretta saying he would never hire another female sales person ECF No. 64-1 at 215; Andretta acknowledged calling Rorke "Toots" ECF No. 64-3; Andretta would intentionally make Ashley Frye Martinez cry, going so far as to make bets as to how fast he could make her cry ECF Nos. 64-2 and 69-5; Andretta would refer to Shannon Fink as a 'Pop Tart' and a hooker ECF No. 69-5; Bryan Sage testified that Andretta would offend Rorke "at least on a daily to a multiple times a week" ECF No. 69-5.

another of Andretta's intentional antagonizations directed at Rorke, the lone female salesperson.[192]

## 2. Sexual Harassment based on a Hostile Work Environment

"To establish a Title VII hostile work environment claim against one's employer, a plaintiff employee must prove:

> 1) the employee suffered intentional discrimination because of his/her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of respondeat superior liability."[193]

Discrimination that is either "severe or pervasive"[194] is a fact-intensive inquiry and is determined by "looking at all the circumstances."[195] "'Severity' and 'pervasiveness' are alternative possibilities: some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive."[196] "'Isolated incidents' will amount to harassment if 'extremely serious.'"[197] "However, a plaintiff must plead the incident to 'be extreme to amount to a change

---

[192] Because, if parity among employees were the primary consideration, Andretta could have changed the pay structure so that all sales persons could keep their draw by selling 10 cars per month like Rorke.

[193] *Minarsky v. Susquehanna Cty.*, 895 F.3d 303, 310 (3d Cir. 2018) *quoting Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

[194] *Castleberry v. STI Group*, 863 F.3d 259, 264 (3rd Cir. 2017). Defendants mistakenly state that plaintiffs must show discrimination that is both severe *and* pervasive.

[195] *Harris v. Forklift*, 510 U.S. 17, 23 (1993).

[196] *Castleberry*, at 264. (internal citations and quotations omitted).

[197] *Id.*

in the terms and conditions of employment' for it to serve as the basis of a harassment claim."[198]  A court must consider the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[199]  "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to" a hostile work environment.[200]

Here, I find that the totality of the circumstances surrounding the work environment Andretta created at the Aubrey Alexander Toyota dealership was sexually hostile, although the standard is written in the disjunctive,[201] both severely and pervasively because of sex to survive the motion for summary judgment.  The record is replete with instances of Andretta using the word 'pussy;'  Andretta would call women crazy bitch, dumb bitch 'Toots', hooker, and 'Pop Tart;' Andretta would call employees 'dickheads' and advise them to 'grow a set of balls;' at morning sales meetings, in front of all the sales people, Andretta would ask a male employee about his sex life; Andretta told multiple employees to "get[]

---

[198]  *Id.*

[199]  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

[200]  *Faragher v. Boca Raton*, 524 U.S. 775, 786-87 (1998) (internal quotations and citations omitted).

[201]  *See Castleberry, supra.*

good at sucking dick, so that way you'd have something warm in your belly in the unemployment line."

For all of these reasons, this claim survives.[202]   However, this determination does not end my inquiry as to this claim, since Defendants have raised an affirmative defense.

### a.   *Ellerth/Faragher* **Affirmative Defense to Constructive Discharge**

The *Ellerth/Faragher*[203] doctrine acts as a shield from employment discrimination claims when there is no 'tangible employment action.' *Ellerth/Faragher* hold employers strictly liable for supervisor harassment that "culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment."

However, "when no tangible employment action is taken, the employer may defeat vicarious liability for supervisor harassment by establishing, as an affirmative defense, both that 'the employer exercised reasonable care to prevent

---

[202] *Grazioli v. Genuine Parts Co., 409 F. Supp. 2d 569, 577 (D.N.J. 2005) (finding frequent use of the word 'pussy' along with other disparaging comments about women both gender based and 'severe or pervasive' to survive summary judgment); *U.S. E.E.O.C. v. Scolari Warehouse Markets, Inc.*, 488 F. Supp. 2d 1117, 1138 (D. Nev. 2007) (finding that male employees looking at hookers online, discussing women's bodies, including their 'pussies' rise to the level of severe or pervasive conduct (or add to that conduct) to create a hostile work environment sufficient to survive summary judgment); *Bader v. Special Metals Corp.*, 985 F. Supp. 2d 291 (N.D.N.Y. 2013) ("Detailed variety of appalling misogynist conduct, including … sexually suggestive comments… 'blow job,' 'slut,' 'whore,' and 'cunt,' …sufficiently severe or pervasive to create hostile work environment.")

[203] *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765 (1998);.*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

and correct promptly any sexually harassing behavior,' and that 'the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'"[204]  This a two part affirmative defense for the employer, centered around an employer's effort to install effective grievance procedures as well as the employee's effort to report harassing behavior.

"The cornerstone of this analysis is reasonableness: the reasonableness of the employer's preventative and corrective measures, and the reasonableness of the employee's efforts (or lack thereof) to report misconduct and avoid further harm."[205]  "Thus, the existence of a functioning anti-harassment policy *could* prove the employer's exercise of reasonable care so as to satisfy the first element of the affirmative defense."[206]

Although Aubrey Alexander Toyota had an employee handbook that set forth a grievance procedure, there is also evidence that the patriarch of the family business, Blaise Alexander, and a staff member from human resources knew of at least some of Andretta's behaviors.  Genuine issues of fact therefore preclude the grant of summary judgment based on this affirmative defense.

---

[204]  *Pennsylvania State Police v. Suders*, 542 U.S. 129, 145-6 (2004), (*quoting Ellerth,* at 765.

[205]  *Minarsky*, at 303.

[206]  *Id.* (emphasis in original).

For example, Chad Scholl testified that Blaise Alexander "did not seem surprised" to hear about Andretta's behavior, because Scholl "heard through the grapevine that he spoke to Matt Barto [] as well."[207] Bryan Sage testified that Andretta would make comments about Sage's wife in front of "Kim Rorke, Ashley Martinez, even Terry Stauffer – the HR rep."[208] The fact that the dealership owners may have known of Andretta's behavior calls into question whether this employer took reasonable care to prevent and correct harassment. I therefore end my analysis here and I do not turn to the second element of the affirmative defense.[209]

## III.   CONCLUSION

For all of the stated reasons, the Defendants' motion for summary judgment is denied.

An appropriate Order follows.


BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[207] ECF No. 69-9.

[208] ECF No. 69-5.

[209] Whether Rorke had a reasonable fear of retaliation such that that her only option was to quit.